CALIFORNIA TRUCKING ASSOCIATION, a California non-profit corporation, on behalf of its affected members, Plaintiff,

v.

Thomas P. CORCORAN, as agent of and Administrator for the East Bay Drayage Drivers Security Fund, et al., Defendants.

No. C–76–2242 WHO.

United States District Court, N. D. California.

Jan. 31, 1977.

Wesley J. Fastiff, Harry Finkle, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for plaintiff.

Duane B. Beeson, Brundage, Beeson, Tayer & Kovach, San Francisco, Cal., for all defendants but Biegal.

James H. Quirk, Brobeck, Phleger & Harrison, San Francisco, Cal., for Biegal.

## OPINION AND ORDER

ORRICK, District Judge.

Plaintiff employer, California Trucking Association (CTA), brings this action for injunctive and declaratory relief against defendant Trustees of the East Bay Drayage Drivers Security Fund (the Fund) and against defendant Teamster and Auto Truck Drivers Local 70 (the Union). Plaintiff alleges that defendants' attempts to demand and receive, from CTA, trust fund contributions in the absence of any written agreement authorizing such payments violate Section 302 of the Labor-Management Relations Act (the Act). 29 U.S.C. § 186. Plaintiff moves for summary judgment and defendant Union moves for a stay of proceedings pending dispute resolution under the provisions of the collective bargaining agreement (the Agreement) to which CTA and the Union are parties. For the reasons hereinafter stated, the Court denies plaintiff's motion and grants the motion of defendant Union.

## I. FACTS

The Agreement between CTA and the Union, effective for the period between April 1, 1976, to and including March 31, 1979, describes, in Article 59, the payments which CTA is obligated to make to the Fund as follows:

"Section 1. Payments

(a) Employers subject to this Agreement shall pay into the East Bay Drayage Drivers Security Fund the following minimum monthly sums for each eligible employee working under this Agreement:

Effective April 1, 1976 – $121.72 per month
Effective April 1, 1977 – 134.72 per month
Effective April 1, 1978 – 143.38 per month

The Employer shall maintain the benefits in effect as of March 31, 1970, at a cost to be determined actuarially. The negotiated increases are to be used to maintain only those benefits.

Increases in contributions that may arise prior to April 1, 1976, 1977 and 1978, shall be credited against the specific negotiated increases that became effective on the above dates."

The Trust Agreement (originally adopted in November, 1952, and renewed in July, 1976) establishing the Fund incorporates Article 59 of the Agreement by providing that "Each employer shall pay the Trust Fund on or before the 10th day of each month a monthly welfare payment as prescribed in the collective bargaining agreement to which the Employer is a party * * *." [1]

During October, 1976, the Trustees passed a resolution requiring CTA employers to increase contributions to the Fund by $21.66 over and above the currently effective contribution rate of $121.72 per month. On or about October 6, 1976, the Trustees mailed demands for the $21.66, effective

---

1. This structure enables the Fund to service numerous employers and unions while permitting payment negotiations to be carried out on a more local or individual level. In other words, payments flow into the Fund under a number of collective bargaining agreements negotiated locally; Article 59 of the Agreement involved here is but one of the many streams emptying into the more centrally administered pool of funds.

Thus, the Trust Agreement can be described as merely a formal conduit, whereas the substance of the payment plan is contained in the Agreement. In this regard, Article 59 appears to combine features of both "level of benefits" and "fixed contribution" plans. *See, e. g., Negotiation and Administration of Health and Welfare Programs*, 80 Monthly Labor Review 576 (1957). On its face, Article 59 sets out 1970 as the peg date for "level of benefits" and is arguably interpretable as follows: First, the $121.72 per month, currently payable, may be used for *any* benefits (whether "1970 benefits" or not), in the Trustee's discretion. Second, the negotiated increases ($13 in 1977 and $8.66 in 1978) may be used to maintain *only* "1970 benefits"; in other words, the Trustees may not require those increases of CTA if they will be used to support non-1970 benefits. Third, the Trustees may require *more* than the negotiated increases of CTA at any time if such additional payments are necessary to maintain 1970 benefits; this arises out of CTA's obligation to "maintain the benefits in effect as of March 31, 1970, at a cost to be determined actuarially". As will be further discussed in the text, this reading of Article 59 is a facial reading only—the Court at this time does not deem the contract language so clear as to preclude varying interpretations in light of the bargaining context.

October 1, 1976, to all CTA employers. This $21.66 represents, on its face, an acceleration into the present, by the Trustees, of the negotiated increases not due until 1977 ($13) and 1978 ($8.66). CTA alleges (and defendants do not appear to dispute this allegation) that the additional $21.66 will be used to support "new" or non-1970 benefits.[2] The crux of CTA's claim in this litigation is, therefore, that the Trustee's demands for an additional $21.66 to support non-1970 benefits go beyond the demands allowable under Article 59, and must hence be enjoined under Section 302 of the Act as demands for payments whose "detailed basis" is *not* "specified in a written agreement with the employer". 29 U.S.C. § 186 (c)(5)(B). In opposition, defendants argue that Section 302 has not been violated because *their* construction of Article 59 fully supports the Trustees' demand for an extra $21.66 per month. Thus, the factual issue in this case boils down to interpretation of Article 59 of the Agreement.

## II. JURISDICTION

Before reaching the factual contentions, the jurisdictional basis for this lawsuit should be set forth.

Section 302 of the Act provides severe restrictions on payments and loans by employers to employee representatives, labor organizations, officers and employees of labor organizations, and employees or groups or committees of employees. The major exception to these restrictions is Section 302(c)(5) which permits payments to employee trust funds, if certain strict requirements are met. *Insley v. Joyce*, 330 F.Supp. 1228, 1231 (N.D.Ill.1971), distilled the requirements of Section 302(c)(5) into six components:

"(1) the trust fund must be established for the sole and exclusive benefit of employees and dependents;

(2) payments must be held in trust to pay, from principal or income, for such employees' medical care, pensions, illness, etc.;

(3) the detailed basis of payments must be set forth in writing;

(4) employers and employees must have equal representation, with a provision for a neutral person or umpire;

(5) the plan must contain provisions for an annual audit; and

(6) there must be separate trusts for pension and annuity funds."

Although most of the litigation surrounding Section 302(c)(5) has involved the first requirement (namely that the Fund be for the "sole and exclusive benefit" of employees), plaintiff here rests its complaint on the third requirement, namely, that the "detailed basis of payments must be set forth in writing".

In a leading case on this "written agreement" requirement, *Moglia v. Geoghegan*, 403 F.2d 110 (2d Cir. 1968), the Second Circuit held that where an employer had never executed either a written collective bargaining agreement with the union or a written trust agreement for the union's pension fund, payment by the fund's trustees of pension benefits to an employee's widow was prohibited under Section 302(c)(5). CTA's claim here is far more subtle, however, since in *Moglia* there was *no* executed written agreement, whereas in this case there *is* such an agreement (Article 59) and CTA's contention is, simply, that the Trustees have exceeded it.

---

2. The 1970 benefits allegedly included a basic major medical plan, life insurance, accidental death and dismemberment insurance, and limited dental, vision, and drug benefits.

The new, or non-1970 benefits, purportedly being supported by the accelerated negotiated increases allegedly include a new dental program adopted by the Trustees on February 1, 1974, providing for coverage at 100% rather than 90% of schedule and for new orthodontia benefits; a weekly indemnity program for dis- abled participants at $3.78 implemented on the same date; a change to a new vision plan with upgrading of benefits to employees, which cost the employers an additional $1.56; a retiree medical plan added on August 1, 1974, at a cost of $4.72 per employee per month; upgrading of major medical and surgical benefit schedules effective February 1, 1975, at a cost to plaintiff's affected members of $3.93 per employee per month.

The Ninth Circuit has adopted the principle that Section 302(e) grants district courts jurisdiction over actions involving "structural" deficiencies in the relevant trust which cause it to violate Section 302(c)(5), but *not* over actions involving only questions of day-to-day fiduciary administration of welfare and pension funds. *Burroughs v. Board of Trustees*, 542 F.2d 1128 (9th Cir. 1976); *Alvares v. Erickson*, 514 F.2d 156 (9th Cir. 1975). *See also, Lugo v. Employees Retirement Fund*, 366 F.Supp. 99 (E.D. N.Y.1973); *Insley v. Joyce, supra; Porter v. Teamster Funds*, 321 F.Supp. 101 (E.D.Pa. 1970).

■ Although the boundaries of this "structural"/"administrative" dichotomy have yet to be fully delineated, it is quite clear that "structural defects" are not limited to those departures from Section 302(c)(5) which are etched into the trust agreement for all time. In other words, trustees can commit "structural" violations during administration of the trust:

"The structural deficiency test does not depend solely on the structure of the trust fund at its inception. As the court in *Porter, supra,* reasoned:

'[T]he claims relating to structural violations need not be directed to the point in time when the trust funds were created and the first contributions made. To so hold would create grave practical problems. Let us suppose, for example, that a trust fund is created and initially administered in accordance with the structural requirements of Section 302(c)(5). If at some future point during the trust fund's existence it were either amended or administered in such a way as not to comply with those provisions, such would be a structural violation over which this Court would have jurisdiction under Section 302. Such a conclusion is necessary to protect the beneficiaries and the funds previously paid into the trust. 321 F.Supp. at 103–04.'" *Alvares v. Erickson, supra,* 514 F.2d at 165–166.

Thus, "the Court has jurisdiction to review the Board of Trustee's administration of the trust fund as well as the specific terms of the trust plan" in determining whether structural defects exist. *Burroughs v. Board of Trustees*, 398 F.Supp. 168, 174 (N.D.Cal.1975).

In this case, the determination of whether the alleged defect is "structural" or "administrative" is really the same as the determination (discussed in conjunction with *Moglia v. Geoghegan, supra*) of whether there is or is not a "written agreement" covering the Trustees' demands for an extra $21.66. Thus, if defendants' view is adopted, the defect, if any, is "administrative" because, as the Trustees have routinely interpreted the Agreement, Article 59 covers the $21.66 demanded. However, if plaintiff's view is adopted, the defect is "structural" because Article 59 does *not* cover the $21.66 and, therefore, no written agreement supports the demand. From defendants' vantage point then, CTA is twisting an accounting question, an issue bearing on the interpretation and *scope* of an agreement into a question involving the very *existence* of an agreement. On the other hand, CTA sees defendants as evading the structural requirements of Section 302(c)(5) by attempting to stretch an existing agreement (Article 59) to cover heretofore unenvisioned payment demands.

■ The following considerations have persuaded the Court to assert jurisdiction here. First, as the Ninth Circuit has held, "Section 302(e) grants district courts jurisdiction *to determine* whether the provisions of a given retirement fund constitute a structural defect in violation of § 302(c)(5)". *Burroughs v. Board of Trustees, supra,* 542 F.2d at 1130 (emphasis added). In other words, *jurisdiction* under Section 302(e) is based upon sufficient *allegation* of a structural defect, whereas the *merits* hinge upon *proof* of such defect. Here, CTA *has* adequately alleged a structural defect by cogently supporting its argument that Article 59, on its face, does not authorize the Trustees' demand for $21.66 extra and that, therefore, *no* written agreement justifies this demand.

Second, the *Moglia* Court wrote:

"Under Section 302, *any* payment made by an employer to an employee represent-

ative, and this includes trustees administering a pension trust fund, and the receipt of such payments by an employee representative are absolutely forbidden unless there is a written agreement between the employer and the union specifying the basis upon which the payments are made." *Moglia v. Geoghegan, supra,* 403 F.2d at 116 (citations omitted).

This language strongly suggests that Section 302(c)(5) is violated not only where there is *no* written agreement but *also* where a written agreement exists and trustees demand payments in *excess* of that agreement. Such excess demands would, similarly, amount to "structural" defects. This conclusion is also mandated by the language of Section 302(c)(5) itself, which requires that "the detailed basis" of payments be specified in a written agreement. Clearly, there would be no purpose to such a requirement if trustees could exceed the payment "details" of a written agreement without violating Section 302(c)(5).

 Third, the legislative policy behind Section 302 militates against a jurisdictionally narrow interpretation of Section 302(c)(5). The Ninth Circuit in *Alvares v. Erickson, supra,* 514 F.2d at 164, noted the potential breadth of federal jurisdiction under Section 302, and summarized Congressional intent as follows:

"The dominant legislative purpose of the § 302 restriction on payments to employee representatives was to prevent employers from tampering with the loyalty of union officials, and to prevent union officials from extorting tribute from employers."

In this case, the Trustees' allegedly excessive payment demands have been backed by union strike threats, however veiled. In *Moglia v. Geoghegan, supra,* 403 F.2d at 116, the Second Circuit wrote:

" * * * The reason for the rigid structure of Section 302 is to insure that employer contributions are only for a proper purpose and to insure that the benefits from the established fund reach only the proper parties. Any erosion of the strict requirements of this section could provide an unintended loophole for the unscrupulous, and could result in a diversion of funds away from the proper parties as had occurred before Section 302 was enacted." (Citations omitted.)

The instant litigation appears to fall on the fine line between routine "administration" and "structural" alteration—between interpreting an agreement and exceeding it. Nevertheless, *Alvares, Moglia,* and Congressional purposes indicate that where, as here, plaintiff has cogently alleged payment demands which are in excess of any written agreement and which are supported by threat of economic action, the Court should assert jurisdiction.

Therefore, the Court has jurisdiction over this action under Section 302(e).

## III. SUMMARY JUDGMENT

CTA moves for summary judgment essentially on the grounds that Article 59 is clear on its face and that this clear meaning of Article 59 precludes the Trustees' demands for an additional $21.66.

In response, defendants argue that summary judgment may not now be granted with respect to interpretation of Article 59 because there are "genuine issues of material fact" (Fed.R.Civ.P. 56(c)) regarding:

1. Whether "past practice" between CTA and the union justifies acceleration of negotiated increases and thereby legitimizes the Trustees' demands for $21.66 under Article 59;

2. Whether the Trustees' demands for $21.66 are authorized by Article 59 as interpreted in light of certain discussions which occurred during negotiation of the Agreement; and

3. Whether utilization of the additional $21.66 for "new" benefits is justified by consideration of various savings and credits to the Fund as well as by consideration of the current cost of "1970 benefits".

The summary judgment issue boils down to a battle of affidavits. Defendants proffer the affidavit of Chuck Mack, Secretary-Treasurer of Local 70, as evidence that genuine factual disputes exist. Plaintiff coun-

ters with several affidavits, principally of Gordon Bell (CTA Trustee), Herschel K. McDougald (CTA Labor Consultant), William J. Campbell (Fund Consultant), and Gordon Kirby (CTA Labor Relations Director).

Mack's affidavit indicates that under the predecessor (1970–1973) collective bargaining agreement negotiated increases had, in fact, been accelerated. In opposition, Bell's affidavit argues that such past acceleration cannot support the inference that negotiated increases may be currently used to purchase "new" benefits. Mack's affidavit also indicates that the parties had reached an understanding during previous negotiations regarding the purchase of new benefits with negotiated increases; however, Mack admits that the Union has been unable to change the Agreement language to more clearly reflect this understanding. In contrast, the affidavits of Bell and McDougald appear to put the nature and relevance of this understanding in issue.

Finally, Mack's affidavit contends that maintenance of "1970 benefits" would currently cost more than the $121.72 allotted by Article 59 and that Article 59 would require CTA to pay this increased cost in order to support the "1970 benefits". However, the "1970 benefit" plans are outmoded or inefficient because less than 500 of the 10,000 beneficiaries covered by the Fund continue to utilize these plans.[3] In other words, since the cost of a plan is an inverse function of the number of beneficiaries utilizing that plan, the "1970 benefit" plans currently cost as much as, if not more than, newer plans with better benefits. Thus, Mack's argument runs, since maintenance of "1970 benefits" would cost at least part of the $21.66 demanded, and since CTA *must* pay this surplus to support "1970 benefits", Article 59, plus common sense, indicate that, because "1970 benefits" are obsolescent, this same accelerated surplus should be utilized to purchase newer, more efficient benefits. Plaintiff counters this

rather compelling argument with the affidavit of Campbell which essentially disputes Mack's contention that "1970 benefits" would currently cost more than $121.72. Campbell's affidavit, after tortuous financial analysis, comes to the conclusion that "1970 benefits" would cost, as of October 1, 1976, no more than $120.73.

Thus, in each of the three areas of alleged factual disputes—"past practice", bargaining history, and current cost of "1970 benefits"—the cross-affidavits on their face show "genuine issues of material fact". However, plaintiff questions the competency and sufficiency of Mack's affidavit when compared with CTA's own evidence.

■ Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment:

"* * * shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The moving party has the burden of clearly establishing that there is no genuine issue of material fact; and his papers are to be scrutinized with care. 6 J. Moore, *Federal Practice* ¶ 56.15[7] at 56–637 (2d ed. 1976). Hearing on a motion for summary judgment must not degenerate into a trial by affidavits. *Redman v. Warrener*, 516 F.2d 766 (1st Cir. 1975); *Lane Bryant, Inc. v. Maternity Lane*, 173 F.2d 599 (9th Cir. 1949); 6 J. Moore, *Federal Practice* ¶ 56.-15[4] at 56–514 (2d ed. 1976). Finally:

"* * * Discretion plays no real role in the *grant* of summary judgment: the grant of summary judgment must be proper under the above principles or the grant is subject to reversal. The trial court may, however, exercise a sound dis-

---

3. Again, it is necessary to note that the Fund covers many employees and employers, only a few of which operate under the CTA Agreement. Thus, the vast majority of Fund employ-

ees are not locked into the 1970 level of benefits. In this respect, 1970 benefits have allegedly become an uneconomical investment for the Fund viewed as a whole.

cretion in *denying* summary judgment where, although the movant may have technically shouldered his burden, the court is not reasonably certain that there is no triable issue of fact; where a portion of an action may be ripe for summary judgment. but it is intertwined with another claim(s) that must be tried; and in certain other situations." 6 J. Moore, *Federal Practice* ¶ 56.15[8] at 56–643 (2d ed. 1976) (emphasis added).

■ Mack's affidavit is competent under Rule 56(e) of the Federal Rules of Civil Procedure in that it is made on personal knowledge, sets forth such facts as would be admissible in evidence and shows that Mack is competent to testify as to the matters stated therein. With respect to the "past practice" and bargaining history issues, CTA contends that Article 59 is clear on its face and that, therefore, evidence of practice and history are inadmissible. First, although the rule in some circuits is that bargaining history is not admissible where the language of the agreement is explicit and unambiguous (*see, e. g., International Union of Electrical, Radio and Machine Workers v. General Electric Co.*, 332 F.2d 485, n.5 (2d Cir. 1964); *Local 13 v. General Electric Co.*, 531 F.2d 1178, n.13 (3d Cir. 1976), the Ninth Circuit rule apparently allows admission of bargaining history despite an unambiguous document. *Communications Workers of America v. Pacific N.W. Bell Telephone Co.*, 337 F.2d 455 (9th Cir. 1964); *Independent Soap Workers v. Procter & Gamble Mfg. Co.*, 314 F.2d 38 (9th Cir. 1963); *Pacific N.W. Bell Telephone Co. v. Communications Workers of America*, 310 F.2d 244 (9th Cir. 1962). Second, even were this Court to follow the contrary rule, Article 59 is not so explicit and unambiguous as to preclude consideration of bargaining history. True, Article 59 may appear on its face to carry a particular meaning, largely by virtue of the clause stating that "negotiated increases are to be used to maintain only [1970] benefits". However,

this meaning in no way excludes, for example, the possibility that negotiated increases may be accelerated pursuant to "past practice". In this regard, commentators have criticized the courts for being unnecessarily restrictive and unrealistic in the interpretation given pension fund agreements and have thereby exhorted the courts to be more imaginative in protecting the financial security of employees. *See, Crawford v. Cianciulli*, 357 F.Supp. 357 (E.D.Pa.1973); M. Bernstein, *Employee Pension Rights When Plants Shut Down: Problems and Some Proposals*, 76 Harv.L.Rev. 952 (1963); N. Levin, *Proposals to Eliminate Inequitable Loss of Pension Benefits*, 15 Vill.L.Rev. 527 (1970); Note, 70 Col.L.Rev. 909 (1970). Thus, this Court would hesitate to preclude, *via summary judgment*, defendants' argument that prior understandings under Article 59 permit negotiated increases to be accelerated and utilized for "new" benefits when, for example, "1970 benefits" have become economically outmoded.[4] In other words, although the "only [1970] benefits" language might *seem* clear on its face, when viewed in light of CTA's apparent obligation to maintain "1970 benefits" at whatever cost, the application of this language becomes subject to varying interpretations, thereby necessitating further factual development.

But, CTA contends, Campbell's affidavit proves that "1970 benefits" are not outmoded (*i. e.*, they do not require acceleration of negotiated increases or payment of more than $121.72) and that Mack's counter-allegations are insufficient. However, Mack's affidavit does make specific allegations of savings accruing to the Fund by virtue of cutbacks on "1970 benefits" and/or substitution of alternative plans.

■ In sum, on all three of the alleged "genuine issues of material fact" plaintiff's affidavits are more detailed and, thus, in some respects more persuasive (with regard to interpretation of Article 59) than is the

4. Although evidence of bargaining history cannot normally be admitted to *modify* a written agreement, *Boyle v. North Atlantic Coal Corp.*, 331 F.Supp. 1107 (W.D.Pa.1971), such evidence can normally be admitted, as here, to *construe* a written agreement. *See, e. g., Communications Workers of America v. Pacific N.W. Bell Telephone Co.*, 337 F.2d 455 (9th Cir. 1964).

affidavit of Mack. Nevertheless, the question for this Court on motion for summary judgment is *not* whose affidavits are better or more convincing because, as stated, there is no "trial by affidavit" under Rule 56 of the Federal Rules of Civil Procedure; rather the question is whether, in light of the counter-affidavits, Mack's statement is *sufficient* to raise a "genuine issue".

■ First, the affidavits indicate that there was some "past practice" with respect to acceleration of negotiated increases. However, there is dispute as to the meaning of this "past practice" vis-a-vis Article 59, and summary judgment should not be granted where contradictory inferences may be drawn from undisputed evidentiary facts. *United States v. Perry*, 431 F.2d 1020 (9th Cir. 1970). Second, there is likewise a "genuine issue" as to the meaning and relevance of prior bargaining understandings to Article 59. Third, although Mack's affidavit is not nearly as detailed as Campbell's in this regard, the question of whether the current cost of "1970 benefits" exceeds $121.72 is still not beyond factual dispute. In fact, although Campbell's affidavit is quite comprehensive and apparently quite careful to err, if anything, on the side of overestimation, Campbell himself seems to have doubts about how to properly evaluate and weigh such factors as coordination of benefits, cleanup cost, mix and increased utilization. Since Campbell's figure of $120.73 is not even one dollar less than the negotiated figure of $121.72, the Court must share some of his apparent doubts.

■ On motion for summary judgment:

" * * * the court must necessarily evaluate the character of the record in light of the legal issues; and it should take care not to adjudicate difficult or complicated legal issues, either of a private or public nature, upon an inadequate factual basis." 6 J. Moore, *Federal Practice* ¶ 56.15[6] at 56–611 (2d ed. 1976).

Here, the Court faces the factually complex issue of interpreting a contractual provision (Article 59) immersed in "past practice", bargaining history, and the nuances of trust

accounting. As stated, the Court has discretion to *deny* summary judgment where it is not reasonably clear that no triable issues remain. In this case, though the affidavit of Chuck Mack is not as specific or factually compelling as it might be, and though CTA's affidavits are strong by comparison, Mack's statement is still sufficiently competent and nonconclusory to raise "genuine issues" with respect to interpretation of Article 59.

Therefore, CTA's motion for summary judgment must be denied at this time.

## IV. STAY OF PROCEEDINGS

Defendant Union now moves for a stay of court proceedings pending dispute resolution under the Agreement—a resolution process which may lead, ultimately, to arbitration.

Initially, CTA brought the instant suit against the Trustees only. However, when the Union appeared to threaten economic action in response to CTA's refusal to pay the additional $21.66 as demanded by the Trustees, CTA filed an amended complaint (dated November 4, 1976) which joined the Union as a defendant.

On November 3, 1976, the Union filed a grievance against CTA under Article 44 of the Agreement based upon CTA's refusal to pay $21.66 extra as required by the Trustees. This grievance seeks settlement (via party agreement or arbitration) of the interpretation to be given Article 59 and, consequently, of the propriety under Article 59 of the Fund's demand for $21.66.

Article 44 subjects to its grievance and arbitration procedures "any grievance or controversy affecting the mutual relations of the Employer and the Union". There is no doubt that the Union has properly invoked the grievance machinery and that the question of Article 59 interpretation is properly subject to the grievance and arbitration procedures of Article 44. However, CTA argues that since it has invoked federal jurisdiction under Section 302, it is entitled to *judicial* resolution, without delay, of the Article 59 interpretation issue.

Clearly, Article 59 *could* properly be interpreted via grievance and arbitration under Article 44. However, federal courts have also engaged in contract interpretation, under certain circumstances, in conjunction with enforcement of Section 302. See, e. g., *Teamsters, Local 688 v. Crown Cork & Seal Co.*, 488 F.2d 738 (8th Cir. 1973). Thus, the question is: In what forum *should* interpretation of Article 59 be settled—arbitration or this Court? For the reasons that follow, I conclude that Article 59 should be interpreted pursuant to the grievance and arbitration machinery of Article 44.

No case has been found, by, or cited to, this Court holding that a Section 302 court *must not* defer to arbitration an interpretational question clearly subject to arbitration under the relevant collective bargaining agreement. CTA relies most heavily upon *Bricklayers, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975). However, the question in that case was whether a violation of Section 302 is proven where, even though the collective bargaining agreement provides for contributions to a trust, the trust agreement remains unexecuted and the trust fund has not properly been established. Thus, in *Stuart Plastering*, unlike here, there was no question of contract interpretation and, therefore, no issue in dispute to which grievance procedures applied. In this regard, plaintiff glosses over the fundamental distinction between the question of whether what the parties have agreed to is *lawful* under Section 302 and the question of *what* precisely the parties have agreed to. The first question is strictly a Section 302 matter reserved for ultimate decision by the courts; however, the second question is a matter of contract interpretation normally left to grievance and arbitration where the parties have, as here, agreed to utilize such procedures.

Thus, in the "sole and exclusive benefit" cases, the question was not one of interpreting the agreement, but one of whether the agreement *as indisputably interpreted by the parties* violated the "sole and exclusive benefit" requirement of Section 302. *See,*

e. g., *Burroughs v. Board of Trustees, supra; Lugo v. Employees Retirement Fund, supra.* Hence, in those cases there was no question of deferral to arbitration because there was, in effect, no issue to defer. Similarly, in the "written agreement" cases, of which *Stuart Plastering* and *Moglia v. Geoghegan, supra*, are examples, the question was again not one of interpreting the agreement but one of whether the documents involved, admittedly clear on their face, constituted sufficient "writing" for Section 302 purposes. Since the issue was legal sufficiency and not factual interpretation, there was again no matter to defer to arbitration. Here, in contrast, the alleged Section 302 issue is wholly dependent upon the interpretational issue regarding Article 59. In other words, the determination of whether there exists a "written agreement" sufficient under Section 302 rests entirely upon the determination of the scope of Article 59 payments and, therefore, entirely upon interpretation of Article 59.

Plaintiff also relies on *Crawford v. Cianciulli*, 357 F.Supp. 357 (E.D.Pa.1973) which, as it turns out, exemplifies the distinction between interpretation of an agreement and the lawfulness of that agreement under Section 302. *Crawford* focused on a Section 302 counterclaim by employer members of a pension committee against union members for an injunction preventing any further payments for pensions to employees of employers who had ceased making contributions to the fund. The counterclaim encompassed two distinct issues—first, whether payments to employees of employers no longer contributing to a fund violate the "sole and exclusive benefit" requirement of Section 302 and, second, what interpretation should be given to Section 11 of the relevant agreement which provided for termination of an employer, under certain conditions, as a contributor to the fund. Although the *Crawford* court refused to delay or defer the Section 302 question, it *did* defer the interpretational question to arbitration:

"* * * We need not decide, however, whether the Act requires arbitra-

tion of the issue concerning § 11 since it is clear that these issues must be arbitrated under the Agreement.

\* \* \* In addition, Federal labor policy favors arbitration. *Steelworkers Trilogy*, 363 U.S. 564, 574 and 593, 80 S.Ct. 1343, 1347, 1358, 4 L.Ed.2d 1403, 1409, 1434 (1960). The issues concerning § 11 involve interpretation of the Agreement, and therefore under the Agreement are subject to arbitration by the parties. Thus, pursuant to the Agreement the parties must arbitrate these issues." *Crawford v. Cianciulli, supra,* 357 F.Supp. at 376.

In *Crawford*, the Section 302 issue could be decided first because it was purely a question of law and was not factually dependent upon determination of the interpretational issue. Here, however, the apparent Section 302 issue is, again, wholly dependent upon construction of Article 59 and wholly an adjunct to the interpretational core of this litigation. Thus, *Crawford* is, if anything, authority for deferral of the interpretational issue in this case to grievance and arbitration.

Finally, plaintiff cites *Teamsters, Local 688 v. Crown Cork & Seal Co., Inc., supra, L.A. Concrete Pumping Inc. v. Majich,* 84 LRRM 2656 (C.D.Cal.1973), and *Wishnick v. One Stop Food & Liquor Store, Inc.,* 359 F.Supp. 239 (N.D.Ill.1973). These cases are quite distinguishable. In *Crown Cork* there was no indication that any grievance or arbitration procedure applied to the interpretational issue decided by the court; similarly, in *Majich* and *Wishnick* it was clear that the disputes involved were *not* subject to arbitration under the respective collective bargaining agreements. Thus, in all of these cases, unlike here, no deferral was possible. Moreover, *Wishnick* was a suit against employers *by* trustees, while the instant litigation is brought against trustees *by* employers. The important point is that trustees *cannot* normally avail themselves of arbitration provisions in collective bargaining agreements, whereas employers not only *can* but are usually bound to do so. Thus, in contrast to CTA, most trustees have neither the option nor the obligation to arbitrate.

In addition to the absence of precedent mandating denial of the requested stay, the general case law appears to support a grant of that stay. *Local 11 v. G.P. Thompson Electric, Inc.,* 363 F.2d 181 (9th Cir. 1966), involved an original suit (the *Auten* suit) by an employer to enjoin a union from demanding payments to trust funds on the ground that the funds were improperly established under Section 302. Toward the outset of the *Auten* litigation, the union filed a grievance pursuant to the relevant collective bargaining agreement, which grievance resulted in an arbitration award requiring the employer to make payments to the funds. This arbitration award was rendered shortly after the *Auten* court decided that the funds were proper under Section 302. In *G.P. Thompson*, the employer claimed that this arbitration award could not be enforced because it was, essentially, a compulsory counterclaim not raised in the *Auten* action. The Ninth Circuit disagreed:

"We believe that to require appellant to set forth its grievances as compulsory counterclaims in the *Auten* action while said grievances are being processed through the arbitration provisions of the Collective Bargaining Agreement is contrary to the national labor policy as set forth in the Labor-Management Relations Act, and contrary to the principles enunciated in many decisions by the Supreme Court. If one of the disputing parties could, by filing a complaint alleging a grievance outside the scope of the agreement for arbitration, force his opponent to by-pass arbitration and assert counterclaims as to controversies otherwise arbitrable, the desired intent and purpose of arbitration agreements could be effectively frustrated." *Local 11 v. G.P. Thompson Electric, Inc., supra,* 363 F.2d at 185.

Although *G.P. Thompson* is not directly on point, the logic of the case does seem to indicate that an employer should not be allowed to circumvent, by the mere filing of

a Section 302 suit, arbitration of issues which that employer has *agreed* to subject to arbitration. It is just such circumvention which CTA appears to be attempting here.

As stated, the central (perhaps the *only*) issue in this litigation involves contract interpretation—an issue most often raised pursuant to a breach of contract action under Section 301 of the Act. 29 U.S.C. § 185. Indeed, many cases raising Section 302 issues and even arguably involving contract breach have been brought under both Sections 301 and 302. *See, e. g., Alvares v. Erickson, supra; Giordani v. Hoffman,* 295 F.Supp. 463 (E.D.Pa.1969); *Doyle v. Shortman,* 311 F.Supp. 187 (S.D.N.Y.1970). However, in this case, where the *core* issue is essentially a Section 301-type contract interpretation/breach, plaintiff invokes only Section 302. The reason for this is rather obvious—there is much precedent for deferring interpretational issues to arbitration under Section 301, and CTA does not wish to arbitrate the Article 59 question involved here.

CTA's reluctance to arbitrate is further exemplified by a suit it brought in this district about three years ago, *California Trucking Association v. Local 85,* No. 74–2131 GBH (N.D.Cal.1974). In 1973, Arbitrator Kagel ruled that CTA was *not* obligated under the relevant Agreement to make certain payments requested by the Trustees. When the Trustees refused to refund monies which CTA had paid, but which Kagel had ruled unnecessary, CTA brought the above suit against the Trustees, and. eventually the Union, for refund. That suit was brought under both Sections 302 *and* 301, and the court ultimately granted a stay pending arbitration of the refund issue under the terms of the Agreement. In February, 1976, the Ninth Circuit denied CTA's petition for writ of mandamus to compel dissolution of that stay.

At oral argument, CTA indicated that it would not, in the instant litigation, make the same mistakes it made in *California Trucking Association v. Local 85, supra.* Ostensibly, the "mistakes" referred to were the decisions to arbitrate the issues of payment and refund; allegation of jurisdiction here under Section 302 but not Section 301 is clearly an attempted means of avoiding the "mistake" of arbitration. However, this tactic presupposes that plaintiff may manipulate, to a considerable degree, the policies and statutes under which federal courts assert jurisdiction over labor disputes. The Ninth Circuit in *Rehmar v. Smith,* 555 F.2d 1362 (9th Cir., 1976), granted Section 301 jurisdiction over a suit by a trust fund beneficiary against a trustee because the subject matter of the suit involved violation and interpretation of the collective bargaining agreement between union and employer. *Rehmar* seriously undercuts CTA's apparent presupposition concerning a plaintiff's control over the concomitants of federal labor jurisdiction:

"[Plaintiff's] first response is that § 301 is limited to suits between unions and employers and does not cover suits by beneficiaries of workers against the trustees of trust funds. This response is without merit. Section 301 jurisdiction is not dependent upon the parties to the suit but rather the nature or subject matter of the action. Jurisdiction exists as long as the suit is for violation of a contract between a union and employer even if neither party is a union or an employer. *Alvares v. Erickson,* 514 F.2d 156, 162–64 (9th Cir.), *cert. denied,* 423 U.S. 874, [96 S.Ct. 143, 46 L.Ed.2d 106] (1975); *see Smith v. Evening News Association,* 371 U.S. 195, 200–01, [83 S.Ct. 267. 9 L.Ed.2d 246] (1962)." *Rehmar v. Smith, supra,* at 1366.

Since the core subject matter of the instant litigation is the kind of contract breach and interpretation normally cognizable under Section 301, CTA should not be able to avoid the obligations and policies behind Section 301 merely by fashioning this litigation as solely a Section 302 matter.

Throughout its brief, CTA makes statements such as:

" * * * Since the legality of the Trustees' demands under Section 302, *and not the resolution of any rights estab-*

*lished by the collective bargaining agreement between Plaintiffs and Local 70,* is the only dispute presented by this action, deferral to arbitration would be futile and inappropriate." Plaintiff's brief filed November 16, 1976, at 26.

However, such statements merely betray the fact that this suit is essentially a Section 301 contract violation/interpretation transparently clothed as a Section 302 action. The legality of the Trustees' demands under Section 302 are, again, wholly dependent upon the central factual issue in this case which is, *indeed,* the resolution of rights established by the Agreement, *to wit,* Article 59. CTA has further argued that the instant suit is against the Trustees and that it is not obligated to arbitrate with the Trustees. However, the Union, with whom CTA is admittedly bound to arbitrate, is now a defendant in this action, has properly invoked the grievance machinery, and CTA's suit against the Trustees boils down to a dispute with the Union concerning construction of Article 59.[5]

■ Moreover, National Labor Policy clearly indicates that where a dispute concerning interpretation of a labor contract is, pursuant to collective agreement, subject to grievance and arbitration procedures, these procedures must be exhausted prior to judicial review of the dispute under Section 301. *Drake Bakeries v. Bakery Workers,* 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962); *Steelworkers Trilogy,* 363 U.S. 564, 574, 593, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). *Local 11 v. G.P. Thompson Electric,. Inc., supra,* indicates that the same principle is equally applicable to the instant litigation, even though this case has technically been brought under Section 302. Again,

since the fundamental issues here are violation and interpretation of Article 59, issues generally cognizable under Section 301, CTA is properly subject to the exhaustion principle in this case. Furthermore:

> "The federal policy favoring arbitration of labor disputes is firmly grounded in congressional command. Section 203(d) of the Labor Management Relations Act, 29 U.S.C. § 173(d), states in part:
>
> > 'Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement.'" *Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 377, 94 S.Ct. 629, 636, 38 L.Ed.2d 583 (1974).

In this regard, CTA's obligation to exhaust contractual remedies with respect to interpretation of Article 59 appears quite independent of whether this litigation has been brought under Section 301 or Section 302.

In addition, the Norris LaGuardia Act, 29 U.S.C. § 101 *et seq.,* generally prohibits the issuance of court injunctions against economic action by labor unions. *Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), carved out a narrow exception only applicable where the party seeking the injunction is ready and willing to arbitrate the underlying dispute. Since Section 302 *allows* injunctive relief upon proof of violation of its own provisions, CTA's characterization of the instant litigation as *solely* a Section 302 case might, if successful, have enabled CTA to obtain what amounts to a

---

**5.** CTA also utilizes this argument to distinguish *Crawford v. Cianciulli,* 357 F.Supp. 357 (E.D. Pa.1973), in which deferral was accomplished under an arbitration clause in the pension fund agreement itself—a clause which explicitly bound the *trustees* to arbitrate upon deadlock. Again, the Court does not view the attempted distinction as controlling in this case. Here, the trust agreement wholly incorporates Article 59 of the Agreement, the interpretation of which is governed by the grievance and arbitration procedures of Article 44. Thus, it appears that the Trustees would be bound by the inter-

pretation of Article 59 bestowed pursuant to Article 44; at any rate, the Trustees have agreed to be so bound here. The Court cannot allow CTA to join the Union as defendant for the limited purpose of obtaining relief against economic action and then tie the Union's hands by arguing that the Article 59 dispute is a Section 302 suit concerning CTA and defendant Trustees alone. In sum, CTA has agreed to grieve and arbitrate the subject matter of this litigation with the Union; under the circumstances of this case, the Court cannot act as the vehicle for circumvention of that Agreement.

*Boys Market* injunction [6] without complying with the arbitral prerequisites of that decision. Again, an injunction here *would* effectively be a *Boys Markets* injunction because the underlying dispute involves interpretation of Article 59, a clearly arbitrable issue. Cloaking this contract dispute as a Section 302 case should not entitle CTA to circumvent Norris LaGuardia, *Boys Markets*, and the entire legal "system" which, keyed to grievance and arbitration, governs collective bargaining agreements—to hold otherwise would be to subordinate fifteen years of Supreme Court-developed labor policy to a reading of Section 302 which appears unsupported by any legal precedent.[7]

 A trial of the issues in this case would find the Court doing precisely what the *parties* have agreed to do via grievance and arbitration—interpret Article 59. CTA's argument that summary judgment should be granted in this case because the courts cannot take cognizance of bargaining history and "past practice" cuts against CTA when the Union's motion for a stay is considered. By agreeing to subject to grievance and arbitration such matters as the interpretation of Article 59, the parties have essentially agreed that Article 59 is to be construed in the context of bargaining history and past practice because it is precisely this context in which arbitrators operate. A. Cox, *Reflections Upon Labor Arbitration*, 72 Harv.L.Rev. 1482 (1959). The fact that arbitrators are more expert than the courts in matters of labor contract construction—more versed in reading contract

provisions in the accepted and agreed to context—is all the more reason for deferring Article 59 to grievance and arbitration. That settlement of the factual disputes raised by the affidavits in this case is essentially a matter for the parties who *wrote* Article 59 and for arbitration is but a corollary of this Court's hesitancy to decide the issue on summary judgment. In addition, the fact that defendants have passed the threshold of summary judgment here is ample proof that the position they will espouse in arbitration is not frivolous. However, even *were* defendants' claim frivolous, it is unlikely that a stay could be denied on this ground for, in deferring to arbitration, "the courts have no business weighing the merits of the grievance". *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

 In sum, this case has taken the Court through the maze of national labor relations. On the one hand, plaintiff invokes the rigid and important policy behind Section 302; on the other hand, defendants bring to bear the arbitration policy behind the *Steelworkers Trilogy, supra*, which has formed the cornerstone of labor relations in this country for many years. The Court believes that the resolution achieved in this case appropriately accommodates and honors each of these policies according to their relative importance in the instant context. Jurisdiction has been exercised under Section 302 because this case *does* have strong Section 302 overtones—if CTA's interpreta-

---

6. Initially, CTA sought only a Section 302 injunction against the *Trustees* for unlawfully demanding the extra $21.66. However, as stated, when the Union appeared to threaten a strike over CTA's payment delinquencies, CTA joined the Union as a defendant. Thus, now CTA also seeks to use allegation of a Section 302 violation as a means of enjoining allegedly impending economic action by the *Union*. It is *this* claim for injunctive relief which invokes discussion of *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) and the Norris LaGuardia Act, 29 U.S.C. § 101 *et seq.*

7. Since *Inland Steel Co. v. NLRB*, 170 F.2d 247 (7th Cir. 1948), the courts and National Labor Relations Board have held pension plans to be

"wages" and, in addition, "conditions of employment" which are mandatory subjects of collective bargaining. Judicial treatment of pension plans has been criticized for rarely taking the *Inland Steel* doctrine into account, as well as for ignoring some of the realities of collective bargaining. M. Bernstein, *Employee Pension Rights When Plants Shut Down, Problems and Some Proposals*, 76 Harv.L.Rev. 952 (1963). In this light, it is even clearer that plaintiff cannot take refuge under Section 302 from its contractual obligation to arbitrate essentially interpretational disputes regarding pension and other security benefits.

tion of Article 59 is correct, a "structural" violation of Section 302 has been proved.[8] However, a stay is now granted because, however strong, Section 302 is at this point no more than an overtone here—the central and perhaps only dispute involves interpretation of Article 59, a dispute clearly subject to grievance and arbitration in conformance with the *Steelworkers Trilogy.* Jurisdiction will be retained to reinstate proceedings should the grievance/arbitration machinery break down or to decide any Section 302 issues remaining after arbitration has been completed.[9] Moreover, because the Trustees have agreed to be bound by the interpretation given Article 59 pursuant to grievance and arbitration procedures,[10] and because interpretation of Article 59 should effectively decide the issue of whether there *is* a "written agreement" covering the Trustees' demands for an additional $21.66, the Court does not now anticipate that any substantial Section 302 issues *will* remain after grievance and arbitration machinery has been exhausted.

Finally, there is some question as to whether the Union may now, under the Agreement and under the law, strike against CTA's refusal to pay the additional $21.66 as demanded by the Trustees, *notwithstanding* the fact that the Union has submitted this dispute to grievance and arbitration. Since the issue is not properly before the Court at this time, the Court simply notes that, at oral argument, defendant Union indicated that although it feels it has the right to strike over CTA's pension delinquencies during and despite arbitration, it does not currently intend to take such economic action. The union has used its willingness to enter grievance and arbitration as a wedge in its motion for a stay of the instant proceedings; this motion is itself based in large part on the *Steelworkers Trilogy* in which the groundwork for judicial deferral to arbitration was viewed as the general principle that an "arbitration" agreement is the *quid pro quo* for a "no strike" agreement. In this light, the Court expects that grievance and arbitration of Article 59 will be conducted expeditiously and in good faith.

### ORDER

In accordance with the foregoing Opinion, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment is hereby denied; and

2. Defendant Union's motion for a stay of all proceedings in this action, pending

---

**8.** The policies behind Section 302 have also led the Court to consider and discuss CTA's motion for summary judgment notwithstanding the decision to stay proceedings. In effect, this motion for summary judgment, thoroughly briefed and argued by both sides, was based on plaintiff's argument that Article 59 is clear on its face. Had the Court found plaintiff's contentions concerning facial clarity wholly convincing, and had defendants tendered no plausible alternative interpretation of Article 59, the nature of Section 302's "detailed writing" requirement *might* have caused the Court to hesitate with respect to deferral (particularly since plaintiff's motion for summary judgment antedated defendant Union's motion for stay). Although, as noted, in Section 301 cases judicial inquiry into the merits of a grievance has *not* been a prerequisite to deferral, *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), the Court has wished to leave no doubt in the instant litigation due to the Section 302 overtones as well as to the rather unique issues presented.

**9.** Such a review of an arbitrator's decision for potential Section 302 violations was granted in *Doyle v. Shortman*, 311 F.Supp. 187 (S.D.N.Y. 1970). The *Doyle* court held that judicial review was necessary because an arbitrator cannot compel an illegal act. On this basis, CTA argues that deferral to arbitration in the instant case will allow the arbitrator to compel an illegal act. However, such is clearly not the case. In *Doyle*, the arbitrator *both* construed the agreement *and* held it valid under Section 302, whereas here the arbitrator will only be construing Article 59. Again, because of the dependent nature of the Section 302 issue in this litigation, such issue will virtually disappear once Article 59 has been construed. In addition, even *should* the arbitrator decide a Section 302 issue here, no illegal act will be compelled because the Court is retaining jurisdiction to review, as in *Doyle*, the arbitral decision.

**10.** As stated in Note 5, *supra*, it is likely that the Trustees would be so bound even absent their explicit consent.

resolution, under Article 44 of the Agreement, of the payments demandable under Article 59, is hereby granted.