Willard L. DOYLE et al., Plaintiffs,

v.

Thomas SHORTMAN et al., Defendants.

No. 69 Civ. 2952.

United States District Court,
S. D. New York.

March 3, 1970.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for plaintiffs.

Benenson & Israelson, New York City, for defendants.

## OPINION

LASKER, District Judge.

We are called upon here to determine whether pension and welfare trusts providing benefits for both unionized employees covered by a collective bargaining agreement and non-unionized employees not so covered are valid under the provisions of Section 302 of the Labor Management Relations Act of 1947, 29 U.S.C. § 186.

Plaintiffs move, pursuant to Rule 56 (a) of the Federal Rules of Civil Procedure, for summary judgment in an action to confirm two arbitration awards construing the trust instruments and holding them valid. Defendants oppose the motion and move to dismiss the complaint and to vacate both arbitration awards. Jurisdiction exists under 28 U.S.C. §§ 1331 and 1337 and 29 U.S.C. §§ 185 and 186. There being no genuine issue as to any material fact and the awards having been made in accordance with the requirements of the Federal

Arbitration Statute (Title 9, U.S.C. § 1 ff) and within the scope of the arbitrator's jurisdiction, plaintiffs' motion is granted and defendants' motion is denied.

Plaintiffs are the employer-designated trustees and deputy trustees of the Building Service Pension Fund and the Building Service Welfare Fund, while defendants are the union-designated trustees and deputy trustees of these same funds. The trusts were established by Locals 32B and 164 of the Building Service Employees International Union, AFL-CIO, and two employer associations, Realty Advisory Board on Labor Relations, Incorporated ("RAB") and Midtown Realty Owners Association, Inc. ("Midtown"), to provide pension and welfare benefits for employees and former employees of employers in the building service and maintenance industry in New York City.

In accordance with Section 302(c) (5) of the Act, the agreements under which the funds operate provide for equal representation in the administration of the funds. Each trust is jointly administered by three representatives of the employers in the industry and certain deputy employer trustees and three representatives of the union and certain deputy union trustees.

In December 1968, the trustees of both the Pension and Welfare Funds could not agree as to whether pension and welfare benefits should continue to be paid to non-union employees and former employees who were members of the Funds. This dispute resulted from opposing interpretations of the recent opinion of the Court of Appeals for this Circuit in Moglia v. Geoghegan, 403 F.2d 110 (2d Cir. 1968), cert. denied 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969).

On advice of counsel, the union-designated trustees took the position that the Moglia decision might preclude the continued payment of pension and welfare benefits to non-union employees who were members of the respective Funds. On the other hand, the employer-designated trustees, also on advice of counsel, concluded that the decision had no application to the non-union members of these particular Funds.

Having deadlocked on the question of whether, under the Act as interpreted in Moglia, payments and benefits should be continued to non-union employees, the trustees of both Funds, acting pursuant to the applicable provisions of the respective Trust Agreements, adopted resolutions providing for arbitration of the deadlocks. The distinguished labor arbitrator, Peter Seitz, Esq., was jointly selected to arbitrate the controversies. He held full hearings on the issues and rendered detailed and scholarly opinions and awards. Upon exhaustive analysis of the arguments, he concluded that the payment of pension and welfare benefits to non-union employees and former employees was not precluded by the Moglia decision, thereby sustaining the position of the plaintiffs, employer-designated trustees, in this litigation.

The plaintiffs contend that the provisions of the Trust Agreements are valid under the Act and the interpretation of the Act set forth in Moglia, and consequently that the arbitrator's award which made a holding to that effect is valid and should be enforced.

The defendants admit that the arbitrator had jurisdiction and that his decision was correct in holding that the trust instruments authorized the coverage of the non-union employees, but the defendants argue that the questions to be determined by this court are not solely whether the documents authorized the coverage of non-union employees, but whether such coverage, if it does exist, satisfies the requirements of the Act as construed by Moglia. As the defendants put it, the arbitrator cannot command the trustees to violate the Act.

 There is no doubt that an arbitrator's award cannot compel an illegal act. Minkoff v. Scranton Frocks, Inc., 181 F.Supp. 542, 547 (S.D.N.Y.1960), Metzner, J. Indeed, plaintiffs do not appear to quarrel with this proposition, but merely to consider it irrelevant since they

view the matter as one in which the arbitrator has correctly determined the law.

Finding, as I do, that the arbitrator has correctly concluded that non-union employees are covered by the written trust agreements and written correlative plans, and that this conclusion is not in dispute, the sole question before me is the determination of whether such coverage is legal under the Act as interpreted by the Court of Appeals in *Moglia*.

## THE FACTS

The Building Service Pension and Welfare Funds in question presently provide pension benefits and hospitalization, surgical and life insurance benefits for some 40,000 building service employees in some 5,000 commercial and residential buildings in four boroughs of New York City. From the start it ws clearly the intention of both Funds to provide industry-wide coverage for all employees in or connected with the industry, whether or not they were covered by a collective bargaining agreement. Three earlier welfare funds dating back to 1951 were merged into the Building Service Welfare Fund by a 1964 Trust Agreement which, in pertinent part, permitted any employer who belonged to an employer association to contribute to the Welfare Fund for employees not covered by a collective bargaining agreement. The Trust Agreement also allowed non-members of the associations to participate for such employees under certain prescribed circumstances. As for the Building Service Pension Fund, it was established in 1958 when the two unions and the two employer associations constituted committees to write a Pension Plan and Trust Agreement. These instruments, like the Welfare Trust Agreement, contemplated a broadly industrial program, including pension coverage for certain building service employees who were not covered by collective bargaining agreements requiring contributions to the Pension Fund. In view of these specific provisions in the Trust Agreements and Pension Plan authorizing coverage of non-union employees, the trustees of the Funds, confident of their full compliance with requirements of the statute, have permitted pension and welfare coverage of such employees for many years. Not until the Second Circuit's decision in *Moglia* did the trustees have any reason to question the propriety of their action.

Now, however, in reliance on *Moglia*, defendants raise the question of the legality of the coverage of non-union employees, primarily as it relates to two classes of such employees. First, there are some employers, members of the RAB and Midtown employer associations, who do *not* have collective bargaining agreements with the unions requiring contributions on behalf of their employees, but who nevertheless voluntarily make payments to the two Funds for employees in their buildings. In addition, there are other employers, some of whom belong to the employer associations and some of whom do not (in which case they are required to enter into individual contracts with the unions), who *do* have collective bargaining agreements with the unions covering employees under the locals' jurisdiction, but who voluntarily contribute for those of their employees not covered by such agreements —i. e., those employees who either are members of other building trade and craft unions or are in unorganized job classifications such as supervisors or clericals.

The question presented is whether the inclusion of these non-union employees in the Pension and Welfare Funds established by the specific documents herein described in any way contravenes the language of Section 302.

## THE STATUTE

The establishment of labor-management pension and welfare funds is expressly authorized and regulated by Section 302 of the Act. Subsections 302(a) and (b) make it a misdemeanor for any employer to pay to an employee or employee representative, and for any employee or employee representative to receive, money or other thing of value.

Section 302(c) (5), however, carves out very limited exceptions to this clear prohibition of moneys passing from management to labor, stating that the provisions of (a) and (b) shall not apply to payments to trust funds which meet specified requirements. The requirements of the section are that the employer's payments be made

\* \* \* to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided*, that (A) such payments are held in trust for the purpose of paying \* \* \* pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund \* \* \*; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities; \* \* \*.

The trust funds here under consideration were at all times administered in strict conformity with Section 302. Indeed, the Trust Agreements and Pension Plan were written expressly to conform with the statutory mandate. It is uncontroverted that the instruments in question clearly contained all the limitations upon payments into and out of the funds required by Section 302.

## DEFENDANTS' CLAIMS

The defendants contend:

1) That no "written agreement with the employer" within the meaning of Section 302(c) (5) (B) exists covering the non-union employees;

2) That even if such a written agreement exists, it does not contain the "detailed basis" required by Section 302(c) (5) (B);

3) That even if written agreements exist containing the necessary "detailed basis," such agreements are insufficient in that they do not require payments from non-union employers for a specified period of time; and

4) That the "written agreement with the employer" referred to in Section 302 (c) (5) (B) must be a collective bargaining agreement and no other; and that by the nature of the situation, and in fact, no collective bargaining agreement between the union and the employer exists as to the non-unionized employees.

### 1. The "written agreement" argument

The defendants contend that, notwithstanding the good intentions of the trustees to provide coverage for non-union employees, there is no "written agreement" as required by Section 302 (c) (5) (B) to which the non-union employers are parties. This position belies the facts. The arbitrator dealt thoroughly and decisively with these contentions, determining that the Trust Agreements and Pension Plan did constitute written agreements within the meaning of the Act as to the non-union employers. He found that all the employers, both union and non-union, are parties to the Trust Agreements since they were executed by employer associations on behalf of their non-union as well as their union members. As to the Pension Fund, the arbitrator concluded that when the employer associations signed the collective bargaining agreements creating the Fund, constituted a joint Pension committee to work out the detailed basis upon which payments would be made, and through this Committee developed

and signed a Pension Plan and Trust Agreement, "they were acting directly as agents of all their members in the industry, that is, as employer." (Arbitration Op. p. 20). Similarly, as to the Welfare Fund, the arbitrator found that the associations acted on behalf of all their members, union and non-union alike.

Furthermore, the arbitrator found that the non-union employers became parties to the Plans and Trust Agreements by making contributions for their employees in the industry and by filing the required signed remittance reports with the Funds. The Pension Plan, for example, provides that a non-union employer may qualify as an independent employer if, inter alia, he is a member of an employer association and adopts the Plan. (Article I, § 8). As specified in the bulletin of the affected employer association, adoption of the Plan is indicated by timely filing of remittance reports. It is clear, therefore, that when non-union employers whose contributions are now in controversy timely filed such reports, they acknowledged in writing their agreement with the Plan. To nail down the question, the arbitrator found that subsequent regular filing of such reports, together with payments to the Funds, forcefully demonstrated adoption of the Plan.

The arbitrator accordingly concluded that the non-union employers here, by reason of the execution of the Plans and Trust Agreements by their bargaining agents for such purposes (that is, the employer associations) and by reason of the adoption of these Agreements thereafter, became and remained parties to a written agreement within the meaning of Section 302(c) (5) (B) of the Act.

I accept these conclusions of the arbitrator. Although it appears that a non-union employer may at any time discontinue contributions on behalf of his employees, it is equally true that whatever payments he does make will be strictly held pursuant to the terms of the Trust Agreements and Pension Plan and that his employees will be the sole and proper beneficiaries thereof. Common law principles of agency (and, indeed, perhaps estoppel) would prevent him from contending to the contrary; he would, as a matter of law, be held to have ratified the Trust Agreements executed in his behalf by his bargaining agents.[1] While it may be argued that the employer's obligation would be more specifically indicated by an individual written agreement between each employer and the union providing the desired coverage of non-union employees, such an arrangement is not necessary and I do not find the structure of documents agreed upon herein to be in violation of statutory requirements of the Act.

### 2. *The "detailed basis" argument*

■ Defendants do not deny that the two Trust Agreements and the Pension Plan clearly describe the manner in which non-union employees may be covered by their employers for pension and welfare benefits. What they do claim, however, is that these documents are not sufficiently detailed in that the rate and amount of contribution are not specified in the instruments themselves but only in the various collective bargaining agreements which are otherwise inapplicable to the voluntarily covered non-union employees. It is true that, under the Pension Plan, for example, an independent employer (i. e., one who has no con-

---

1. See, e. g., Lewis v. Cable, 107 F.Supp. 196 (W.D.Pa.1952), where an employer was held, on the basis of his prior contributions to a welfare trust fund, to have ratified a collective bargaining agreement which was executed on his behalf by an employer association (of which he was a member) and whose authority to do so he was also found estopped to deny. See also Rabouin v. National Labor Relations Board, 195 F.2d 906 (2d Cir. 1952), holding that where an employer who is a member of an employers' association accepts the benefits of and operates under a collective bargaining agreement negotiated by such association, he becomes a party by estoppel to such contract and is bound by its terms, though he never actually signs it.

tract with the union but who is a member of an employer association) is supposed to make contributions with respect to each of his employees at the same rate as that specified in the collective bargaining agreement between the employer association and the union. On the other hand, as regards the frequency of payments, the Plan provides that they shall be made "at such times (but in no event less frequently than quarterly) and in such manner as the Trustees shall direct." (Article II, § 1). In any event, the short answer to defendants' objection is that there is no rule which holds that the Trust Agreements and Plan must themselves specify the specific amount, or even the rate thereof, to be contributed. Indeed, the authorities clearly suggest that other documents may properly be referred to for that purpose. See, e. g., Thomas v. Reading Anthracite Co., 264 F.Supp. 339 (M.D. Pa.1966); Ramsey v. United Mine Workers of America Welfare and Retirement Fund, 231 F.Supp. 909 (E.D.Tenn. 1964).[2]

Inasmuch as the amount of contribution is determined by the union and the employer associations in collective bargaining, and not by the trustees, it is quite natural, not to say customary, that such a figure is specified in the resultant collective bargaining agreement. Certainly the statutory purpose behind this requirement of a "detailed basis," that is, to prevent improper diversion of trust assets, is not threatened by this incorporation by reference of amounts specified in a collective bargaining agreement, a document widely disseminated, constantly referred to by the parties, and not easily tampered with.

Finally, as regards the claimed absence of a detailed basis, the arbitrator has found (and defendants do not dispute) that the Trust Agreements and Plan expressly provide the detailed basis upon which contributions shall be received both from non-union employers (i. e., the so-called independent employers) and from the union employers (i. e., the so-called collective bargaining employers) with respect to those of their employees in non-bargaining unit jobs. The arbitrator has dealt fully with this facet of the matter, and it is unnecessary to embroider his considered statement.

### 3. The "non-requirement" argument

Defendants further contend that, even assuming the existence of the required written agreements, they are legally insufficient in that they do not *require* the non-union employers to continue contributions for any specified period of time. I find nothing either in the language of Section 302(c) (5) or in the *Moglia* decision itself which suggests that employers must obligate themselves to continue payments for a particular period of time. The intent of the statute was not to require employers to make contributions in their employees' behalf, but only to insure that such contributions, once made, would reach their proper destination. The mere fact that non-unionized employees would cease to receive benefits in the event that their employers discontinued contributions does not mean that contributions already made will not reach that proper destination.

### 4. The argument that the "written agreement with the employer" must be a collective bargaining agreement

Defendant union trustees' final and most significant objection to the participation of non-union employers in

---

2. In fact, in the District Court opinion in the *Moglia* case, Judge Ryan found the statute satisfied by a similar multi-document arrangement:

"While the statute does not specify that the written agreement be a collective bargaining agreement, it certainly encompasses such an agreement or even two related contracts, such as the parties here had—one for the purpose of establishing the Fund and for imposing conditions for membership in the Fund; and the other for specifying the basis of the contributions." Moglia v. Geoghegan, 267 F.Supp. 641, 646 (S.D. N.Y.1967).

the Funds is that the "written agreement with the employer" required by Section 302(c) (5) (B) must be a collective bargaining agreement and not merely a series of trust agreements and plans. Defendants claim to find support for this argument in the broad language of Moglia v. Geoghegan, supra.

In *Moglia* the court denied pension benefits to the widow of a deceased employee of an employer who had no collective bargaining agreement with the union, despite the fact that this non-union employer had for some twelve years made regular contributions to the pension fund in his employee's behalf and that the employee had satisfied all the eligibility requirements for a pension. However, the *Moglia* decision must be confined to its facts. The non-union employer there involved had refused to enter into any collective bargaining agreement with the union (despite the union's repeated efforts to make it sign one); *nor was it a party to the trust agreement related to the pension fund.* It is also quite clear that the parties to the *Moglia* collective bargaining agreement (and the trustees, as well) had never contemplated that contributions would be made on behalf of employees of non-union employers or that benefits would be paid to employees of such employers. In fact, the pension trust agreement specifically stated that only those individuals who were employed by employers in collective bargaining relationship with the union were to be covered by the fund and eligible for benefits and that contributions would only be received "from employers who signed collective bargaining agreements with the Local requiring such payments." 403 F.2d at 113.

In *Moglia* contributions had been received and accepted from the non-union employer solely because the trustees of the pension fund had neglected, up until the very moment when the deceased employee's widow had applied for a pension, to ascertain whether the decedent's contributing employer had a written collective bargaining agreement with the Lo-

cal detailing the basis for his payments to the fund. Thus, the Court of Appeals was compelled to reach the conclusion that, inasmuch as the trust agreement provided only for contributions from employers who had signed collective bargaining agreements with the union, such a trust agreement could not be deemed to set forth the "detailed basis" upon which payments by non-union employers were to be made into the fund. Furthermore, since the non-union employer in question was never a party to "a written collective bargaining agreement *or any other written agreement*" (emphasis supplied) providing for contributions to be paid by him to the pension fund, 403 F.2d at 115, the court concluded that there was no "written agreement with the employer" as required by Section 302(c) (5) (B).

No such defects are present in the matter before us. Both Trust Agreements specifically provide the detailed basis on which payments are to be made both by non-union employers and by union employers with respect to their non-union employees. In addition, both such Agreements have been executed by employer associations representing these non-union employers and expressly adopted by such employers, as permitted by the Plans, by the submission of written remittance reports signed by them and by the continuous payment of contributions in their employees' behalf. Clearly, the trustees' acceptance of contributions from these employers and the payment of benefits to their employees for a number of years now have not, unlike *Moglia*, been the result of administrative neglect, but rather of express written agreement of the parties. And finally, whereas in *Moglia* the court found that the absence of any written agreement with the non-union employer setting forth the basis for his payments to the pension fund "could provide an unintended loophole for the unscrupulous, and could result in a diversion of funds away from the proper parties as had occurred before Section 302 was enacted" (403 F.2d at 116), it is difficult here to see how the protective purpose

of Congress will be subverted. The Pension and Welfare Trust Agreements and Pension Plan, to which the non-union employers are plainly parties, set forth in detail the bases for pension and welfare contributions by such employers in the New York City building service industry, and thereby furnish the necessary safeguard against abuse of trust funds intended by the statute.

Nor do we find any support in *Moglia* for defendants' contention that the written agreement required by Section 302 (c) (5) (B) must be a collective bargaining agreement. On the contrary, the Court of Appeals indicated that the written agreement with the employer may be a "written collective bargaining agreement *or any other written agreement*" (emphasis supplied), 403 F.2d at 115. Indeed, the court's use of the disjunctive throughout its opinion would seem to imply that if the union and collective bargaining employers had so agreed (which they clearly did not), non-union employers could have participated in the pension trust fund without ever signing a collective bargaining agreement. See 403 F.2d at 118, n. 6. Similarly, while noting that the "reported cases filed under this statute disclose that the usual trust fund agreement is bottomed on a collective bargaining agreement," Judge Ryan observed in his *Moglia* decision below that "the statute does not specify that the written agreement be a collective bargaining agreement." 267 F. Supp. 641, 646 (S.D.N.Y.1967).

Section 302(c) (5) nowhere refers to a collective bargaining agreement in haec verba. This is significant, for if Congress—in this statute dealing extensively with collective bargaining—had intended to require a collective bargaining agreement to the exclusion of any other written agreement, canons of construction dictate the conclusion that it would have said so. That Congress did make such a specific reference to a collective bargaining agreement in subdivision (4) of Section 302(c) makes the omission thereof in subdivision (5) all the more telling. Perhaps of even greater import

than what the statute does not say, however, is what it *does* say. Section 302 (c) (5) allows payments to a trust fund if the fund is for the sole and exclusive benefit of the employees of employers bargaining with the union, and of the "employees *of other employers* making similar payments" (emphasis added). The statute, therefore, clearly contemplates contributions by more than one type of employer. Indeed, several Courts of Appeals, including our own, have recently determined that both the trust itself and the union constitute such "other employers" under the statute and may thus contribute to Section 302(c) (5) trusts as employers on behalf of the employees of the trust and on behalf of the officers and employees of the union, respectively. See, e. g., United States Trucking Corp. v. Strong, 359 F.2d 392 (2d Cir. 1966); Blassie v. Kroger Company, 345 F.2d 58 (8th Cir. 1965). We see no reason to distinguish between such employers and the non-union employers before us. We agree with the arbitrator that:

"The 'employers' with whom Section 302(c) (5) (B) requires a written agreement need not be employers who have collective bargaining relations with the Unions involved; but they must be employers of employees who are within the terms of eligibility of the plan. The employers described in the deadlocked resolution fall within that description." (Arbitration Op., p. 19).

The legislative history of the Taft-Hartley Act is as devoid of support for defendants' suggestion that the written agreement required by Section 302(c) (5) must be a collective bargaining agreement as is the wording of the statute itself. While it is true that the legislative record contains repeated references to the collective bargaining *process* as the means for establishing such trust funds, this is hardly surprising. As Judge Ryan noted in the *Moglia* decision below, "[i]t is difficult to imagine a situation where" a trust fund agreement would not, at least at its inception, be

based on a collective bargaining agreement. 267 F.Supp. at 646. However, inasmuch as the primary intent of the statute is to curtail abuses inherent in the collective bargaining process, general references thereto cannot be deemed determinative of the specific issue at hand. On the other hand, an extensive search of the legislative history has yielded not a single suggestion that the phrase "written agreement" as used in Section 302(c) (5) (B) was intended to mean a collective bargaining agreement to the exclusion of all other writings; nor is there any indication that only employers with collective bargaining relations with the union were to be deemed proper parties to Section 302 trust funds.

The construction of Section 302(c) (5) (B) suggested by the defendants here in no way appears indispensable to the proper effectuation of the congressional intent. Senator Taft himself succinctly stated the purpose of the provision in question, as follows:

"So that the purpose of the provision is that the welfare fund shall be a perfectly definite fund, that its purposes shall be stated so that each employee can know what he is entitled to, can go to court and enforce his rights in the fund, and that it shall not be, therefore, in the sole discretion of the union or the union leaders and usable for any purpose which they may think is to the advantage of the union or the employee." 93 Cong.Rec., Part 4, 80th Cong., 1st Sess.1947, p. 4746.

Apparently, Congress believed that a written agreement specifiying the detailed basis upon which employer payments were to be made would insure that such contributions would only be used for proper purposes and for proper parties, and not as a shield for illegal payments to union representatives. I see no reason why the written agreement affording this desired protection must be a collective bargaining agreement and no other. The Pension and Welfare Trust Agreements and the Pension Plan here under consideration provide the full measure of safety intended by the Congress: they are in writing; they are in definite terms; they inform the employee of his rights under the Fund and afford him a sound legal basis upon which to sue; and they are jointly administered by an impartial Board of Trustees.

Finally, as intimated by the Court of Appeals in *Moglia*, Congress had a secondary motive for enacting Section 302, that of encouraging and fostering the creation and extension of union trust funds. See 403 F.2d at 116. A liberal construction of the meaning of "written agreement" in the case at bar will implement this supplementary congressional intention without sacrificing any of the preventive purposes mentioned above. On the other hand, however, the unnecessarily restrictive reading of the statutory language suggested by defendants would lead, in the arbitrator's words, to "drastic and shocking results," some of which he has sensitively itemized in his opinion. (Arbitration Op., p. 28). To find the "written agreement" requirement of Section 302(c) (5) (B) satisfied only by a collective bargaining agreement would work the further injustice of precluding the establishment of industry-wide pension and welfare funds in industries (such as the one here under consideration) encompassing a significant number of non-union employers. Such a result would clearly contravene a key objective underlying Congress' enactment of the statute.

■ In conclusion, I note my agreement with the rule of construction adopted by the *Blassie* court, supra, in dealing with the identical statutory provision. There, the Eighth Circuit stated:

"We would prefer to approach our present task with a construction policy favoring inclusion and benefits where there is no positive statutory language or inference of exclusion, rather than one favoring exclusion and a denial of benefits where there is no positive language of inclusion." 345 F.2d at 68.

The arbitrator's conclusions as to the matters described above inevitably in-

volve determination of mixed questions of fact and law. However, the specific gravity of the mixture be measured, his conclusions appear sound and his award does not compel the doing of any illegal act.

For the reasons set forth above, plaintiffs' motion for a summary judgment confirming the arbitrator's award is granted; defendants' motion is denied.

It is so ordered.