**Margie NEWBERRY, Plaintiff**

v.

**John J. O'CONNELL et al., Trustees, United Mine Workers of America, Health and Retirement Funds, Defendants.**

**Civ. A. No. 79–0258–A.**

United States District Court,
W. D. Virginia,
Abingdon Division.

Feb. 10, 1981.

Stuart B. Campbell, Jr., Wytheville, Va., Jeanne K. Beck, UMWA, Washington, D. C., for defendants.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

The plaintiff, Margie Newberry, instituted this suit against the defendants, Trustees of the United Mine Workers of America (UMWA) Health and Retirement Funds (Funds), alleging the defendants wrongfully denied her deceased husband a pension. Jurisdiction attaches to this court under 29 U.S.C. § 185(a).[1] The case is presently before this court on the parties' cross motions for summary judgment.

### I.

The plaintiff is the widow of Sherman Newberry, a former coal miner employed in the bituminous coal industry. During his employment in the industry, Newberry was a dues paying member of the UMWA and, at least part of the time he was employed, held a UMWA hospital card.

On April 30, 1973, Newberry applied to the defendants for a retirement pension.[2] The defendants considered the application under Resolutions 90 and 91 of the Board of Trustees of the UMWA Welfare and Retirement Funds, which state that if an applicant has retired prior to December 31, 1976, he shall be eligible for a pension if he has completed twenty years of classified service, including five years of signatory service after May 28, 1946. Signatory service is defined in Resolution 90 as "a year of service ... during which an applicant worked ... as an employee in a classified job for an employer signatory to the bituminous coal wage agreement then in effect." It was determined that Newberry had only two years of the required signatory service

Z. Dale Christian, Bluefield, Va., for plaintiff.

1. *Gordon v. ILWU–PMA Benefit Funds*, 616 F.2d 433 (9th Cir. 1980).

2. The Funds are composed of four irrevocable trust funds established under Article XX of the National Bituminous Coal Wage Agreement of 1974. The particular fund responsible for pro-

and his application was denied.[3] Newberry took exception to this denial and filed a request for a hearing. Prior to the hearing, Newberry died; his widow became appellant in the proceedings.

On February 22, 1977, a hearing was convened on the signatory service issue. The hearing officer determined that Newberry performed classified work for varying periods from 1946 to 1953 with the James B. Keen Company (Keen).[4] This company leased coal rights from Raven Red Ash Coal Company and sold all coal mined to that company. While Keen had not actually signed a collective bargaining agreement with the UMWA, Red Ash, who had signed the agreement, paid royalties into the pension fund on the coal mined by Keen, deducting those amounts from the purchase price of the coal.[5] Based upon these findings of fact, the hearing officer held that pension credit may be given in the Red Ash-Keen-Newberry relationship and, accordingly, credited Newberry with four additional years of signatory service. Pursuant to this decision, Newberry had twenty-seven years of classified service of which six years were signatory. However, on June 14, 1977, the Funds' Fiscal Audit Department reversed the hearing officer's decision on the ground that Keen had not signed the collective bargaining agreement between 1946 and 1953. This ruling was sustained at a subsequent hearing.

## II.

■■■ A statutory framework for union pension trusts is set forth in Title 29 U.S.C. § 186. Under that section payments made by an employer to a union pension trust fund are illegal unless "the detailed basis on which such payments are to be made is specified in a written agreement with the employer." Title 29 U.S.C. § 186(c)(5)(B). Only employees of employers "who are lawfully contributing [pursuant to a written agreement] to a union pension trust fund may qualify as beneficiaries of a [Title 29 U.S.C. § 186] trust." *Moglia v. Goeghegan*, 403 F.2d 110, 116 (2d Cir. 1968). Consequently, the first question for the court's consideration is whether the royalties paid into the union's pension trust fund for the years that plaintiff's decedent was employed by Keen, 1946–1953, were lawful contributions under Title 29 U.S.C. § 186. The court finds that they were.

The statutory requirement that there be a written agreement before contributions can be made to a union pension trust fund does not refer exclusively to a collective bargaining agreement, nor does it require the contributing employer to actually sign the agreement. Rather, it is only necessary that a written agreement between the employer and union or trust fund establish a mechanism for employers to contribute. For example, "if the union and collective bargaining employers had so agreed ..., non-union employers could have participated in the pension trust fund without ever signing a collective bargaining agreement." *Doyle v. Shortman*, 311 F.Supp. 187, 195 (S.D.N.Y.1970). The Bituminous Coal Wage Agreement of 1947, as well as the 1950 Agreement, required signatory operators, which included Red Ash, to pay royalties "on each ton of coal produced for use or for sale," and each agreement detailed the basis on which those payments were to be made. Both agreements provided that it was "deemed a violation" to sell, lease, sub-lease, assign, or otherwise dispose of a mine "for the purpose of avoiding the obligation" to pay royalties. National Bituminous Coal Wage Agreement of 1947, p. 4; National Bituminous Coal Wage Agreement

cessing Newberry's application is the UMWA Pension Trust.

3. It was determined that Newberry had completed twenty-seven years of classified service of which only two years were signatory.

4. It was later established that Newberry also worked for Keen Brothers during this period;

the relationship between Newberry and the two companies was identical.

5. There is a conflict in the record as to whether royalties were deducted from the purchase price of the coal or independently transferred through Red Ash to the pension fund. However, it is clear that Keen paid royalties on the coal mined by Newberry.

of 1950, p. 5. It follows, therefore, that the payments made into the pension trust fund were not only proper under the 1947 and 1950 coal wage agreements, respectively, but also were lawful under § 186.

### III.

The next question for the court's consideration is whether the Trustees' decision is correct. In that regard, the court may not substitute its judgment for that of the Trustees, and may reverse only if it is found that the decision was arbitrary, capricious or made in bad faith, not supported by substantial evidence, or erroneous on a question of law. *Danti v. Lewis*, 114 U.S. App.D.C. 105, 312 F.2d 345, 348 (1962); *Rehmar v. Smith*, 555 F.2d 1362 (9th Cir. 1976). *See generally, Aitken v. IP & GCU–Employer Retirement Fund*, 604 F.2d 1261 (9th Cir. 1979); *Gordon v. ILWU–PMA Benefits Funds*, 616 F.2d 433 (9th Cir. 1980). Finding that the Trustees erroneously applied the law, the court will recommit plaintiff's claim for further consideration.

As previously stated, plaintiff's claim was denied because Keen was not signatory to the coal wage agreement between 1946 and 1953. The court finds, however, that Keen's non-signatory status during those years does not necessarily preclude crediting Newberry with signatory service. If Keen was, in reality, an independent contractor then Newberry could not be credited with five years of employment "as an employee in a classified job for an employer signatory to the bituminous coal wage agreement," but, if the relationship between Keen and Red Ash was such that it could be found that Keen was not an independent contractor then Newberry could be considered, in essence, an employee of Red Ash.

In requiring that an individual work "as an employee in a classified job for an employer signatory to the bituminous coal wage agreement ...," it must be assumed that the Trustees intended that the term "employee," as distinguished from "independent contractor," be given its usual construction under the National Labor Relations Act. Section 2(3) of that Act, Title 29 U.S.C. § 152(3), provides that "the term 'employee' shall include any employee ... but shall not include ... any individual having the status of an independent contractor ...." While "employee" and "independent contractor" are not specifically defined by that provision, in explaining the provision's legislative history the Court of Appeals for this Circuit left no doubt but that "[c]ommon law tests are to be used to distinguish between the two":

> ... In 1947 Congress amended Section 2(3) of the National Labor Relations Act to make it clear that independent contractors were not within its coverage. Prior to the amendment some confusion has existed in the courts and before the Board as to the proper meaning of the term "employee" as used in the Act. In *National Labor Relations Board v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), the Supreme Court held that common-law distinctions between employees and independent contractors were not controlling under the Act, and that the word employee as used therein should be interpreted broadly to effect the purposes of the Act. It was primarily this decision which led to the 1947 amendment specifically excluding independent contractors from the Act's protection. Although the amendment did not define the terms "employee" and "independent contractor," its legislative history makes it quite clear that Congress intended the word employee to denote a person who works for another for wages or salary under direct supervision, as distinguished from one who undertakes "to do a job for a price, decides how the work will be done, usually hire[s] others to do the work" and depends for his income not upon wages but upon profit. [Citations omitted.] As stated in *National Labor Relations Board v. Steinberg*, 182 F.2d 850, 857 (5th Cir. 1950):
>
> > "... The usual test employed for determining the distinction between an independent contractor and an employee is found in the nature and the amount of control reserved by the per-

son for whom the work is done, and the employer-employee relationship exists only where the employer has the right to control and direct the work, not only as to the result to be accomplished by the work, but also as to the manner and means by which that result is accomplished. It is the right and not the exercise of control which is the determining element."

Thus, the critical distinction between an independent contractor and an employee is found in the nature and amount of control reserved by the person for whom the work is done. The test, however, admits much more readily of statement than of application. Resolution of the question must depend largely upon the peculiar facts of each case. Moreover, no single factor is controlling and the totality of the circumstances must be considered.

*N.L.R.B. v. A. S. Abell Co.*, 327 F.2d 1, 3–5 (4th Cir. 1964).

On two occasions the National Labor Relations Board has considered the common law distinction between an employee and an independent contractor in the context of a mine-leasing arrangement. In its first decision, *Leckie Smokeless Coal Company*, 160 NLRB 329 (1966), the Board addressed the question of whether certain mine operators, who were extracting coal under their respective lease agreements with the Leckie Smokeless Coal Company, were supervisory employees of Leckie or, instead, independent contractors. In that case, each operator was required by its lease agreement to furnish at its own cost and expense all labor, machinery, tools, supplies, and equipment. Each had to employ, set the compensation for, and discharge its own employees, pay their wages, make all payroll deductions, and pay all taxes. Furthermore, each lease agreement defined the relationship between Leckie and the operator "as that of owner and independent contractor." The Board looked to other factors, however, which it considered not to be indicative of independent contractor status:

... The operators do not have a proprietary interest in the mines, or in the coal extracted therefrom, and cannot transfer or assign any rights to operate the mines without the written consent of [Leckie]. They acquire no right to sell the coal on the open market but must deliver the coal to [Leckie's] tipple at a rate which is unilaterally determined by [Leckie]. The operators' opportunities for profit are substantially impaired by [Leckie's] power to limit production, as well as by [Leckie's] ownership and control of the heavy equipment without which, it appears, the coal could not be profitably extracted from the mines. While the operators may theoretically increase their profits by the selective purchase of supplies, the record discloses that most of their supplies are purchased from [Leckie]. Also, the operators' risk of loss is substantially minimized by the engineering services provided by [Leckie] which are geared to attaining the maximum recovery of coal. By furnishing these engineering services and the heavy equipment, [Leckie] also exercises a measure of control over the manner and means by which the operators extract the coal. In addition, [Leckie] reserves the right to keep inspectors in the mines and to exercise ultimate control over the operators' employees and mining operations in order to protect its property or to enforce conformity to its plan of mining and projection. Moreover, the agreements are for a short term and may be terminated without cause, thus ending the entire arrangement between [Leckie] and the operators.

160 NLRB at 333. On balance the Board, in turn, concluded that the operators were supervisory employees of Leckie and not independent contractors.

In its second decision, *Mutual Coal Company, Inc.*, 170 NLRB 235 (1968), the Board again addressed the question of whether certain mine operators, who were extracting coal under their respective lease agreements, were "administrative segments" of their lessor or, instead, independent contractors. In that decision the Elgin Coal Company, a nonoperating corporation,

leased a large tract of land from Tennessee Products and Chemical Corporation which Elgin, in turn, subleased to various coal mining operators, including the Mutual Coal Company and the Gravit Coal Company. Both subleases were oral agreements terminable at will. Both operators were obligated to deliver all coal produced at their mines to Elgin's tipple and to sell it to Elgin at Elgin's price. Elgin owned the mining equipment used by Mutual and financed seventy-five percent of the mining equipment used by Gravit. Tennessee Products employed a mining engineer whose function it was to oversee the operations of companies that subleased land from Elgin to make certain that the mines were being properly worked. The services of the mining engineer were provided without charge to the operators and failure to follow his instructions could have resulted in cancellation of the lease agreements. For these reasons, the Board concluded that Mutual and Gravit were administrative segments of Elgin and not independent contractors.

*Leckie* and *Mutual* are illustrative of the principle that the manner in which the parties define their relationship is not controlling. Rather, in determining whether a mine-leasing arrangement results in employee status or independent contractor status, the amount of control retained by virtue of the leasing agreement is of paramount importance. In not crediting Newberry with signatory service for those years in which he was employed by Keen, the Trustees failed to consider the nature of the relationship between Keen and Red Ash. Accordingly, the court will recommit plaintiff's claim for further consideration.

Upon remand, the court directs the Trustees to give careful consideration to its own regulations in light of the cases previously cited herein. The court notes that the 1950 Pension Plan contains the language "exercise control over the operation of the mine"; therefore, the Trustees apparently have had the opportunity in thousands of pension cases to rule as to what set of facts establishes "exercise [of] control." Certainly no higher standard of proof of exercising control should be placed on the plaintiff in this case than the standard used in the many other cases where pension rights were granted or denied because of the degree of control exercised. Thus, this court, while pronouncing no new doctrine to the defendants, directs them not to treat this plaintiff in an arbitrary and capricious manner.

As previously noted, Resolution 90, in defining signatory service, states that to qualify for a pension an applicant must work as an employee in a classified job. Self-employed persons, as well as management personnel, are excluded by definition from being signatory to the Bituminous Coal Wage Agreement. In spite of this exclusion, the UMWA 1950 Pension Plan (Exhibit C–1 at 22) additional rules concerning credited service provide as follows:

No credit for service shall be awarded a participant for any period in which he was directly connected with the ownership, operation or management of the mine; provided, however, that in the case of any participant who received credit for such service before July 1, 1974, credit shall be awarded for any period prior to July 1, 1975, in which the participant worked as an employee in a classified job in a mine in which he has no controlling interest, as a member of a cooperative or a gang-working crew which shared the profits and losses, and which was operated under the Bituminous Coal Wage Agreement then in effect; and, provided further, that in the case of a participant who received credit for service before July 1, 1974, credit for signatory service shall be awarded for any period prior to July 1, 1975 during which such participant worked in a classified job pursuant to an agreement to produce coal for a signatory coal company which exercise control over the operation of the mine and was responsible for royalty payments on such coal produced to the 1950 Pension Trust or its predecessor.

(Emphasis added).[6] The underlined portion of the above-quoted language of the pension plan appears to coincide exactly with the facts in this case: the plaintiff's decedent worked in a classified job and produced coal *for* a signatory coal company responsible for royalty payments. Thus, it appears that the only remaining question would be the degree of control exercised by the signatory coal company over the mine where the plaintiff's decedent worked.

However, if the underlined portion is read to be a further clarification of the remaining language quoted, the emphasized language could be read to mean that self-employed and management personnel who sell their coal to a signatory mine, which in turn pays royalties on that coal, are transformed by the plan into a favored class and can receive pensions where mere employees cannot.

Turning to the language of Resolution 90 (Exhibit B at 6, 7), it is obvious that the resolution conflicts with the pension plan where it provides that

> credit shall be awarded for any period in which applicant worked in a classified job in a signatory mine pursuant to an agreement to produce coal for a signatory coal company which exercised control over the operation of the mine and was responsible for royalty payments to the Fund on such coal produced.

Thus, Resolution 90 requires that, to be eligible for pension credit, individuals must work in a signatory mine producing coal for a signatory coal company which exercises control over the mine. In reconciling this conflict between Resolution 90 and the pension plan, counsel Jeanne K. Beck for the UMWA Health and Retirement Fund, stated in a letter to the court that "[i]n summary, the 1950 Pension Plan, although it con-

tinues eligibility under Resolution 90, has superseded that Resolution. The 1950 Pension Plan is the official Document governing the payment of pensions from the 1950 Pension Trust." (Emphasis added).

Therefore, on remand, the Trustees shall set forth all facts relating to the control of Keen by Raven Red Ash, shall place no greater burden on the plaintiff of proof of control than has been placed on other pensioners granted benefits under the language of the UMWA 1950 Pension Plan (Exhibit C–1 at 22), and shall render their decision in accordance with the opinions set forth in *Leckie, supra,* and *Mutual, supra.* An order shall be entered dismissing the case from the docket with leave to either party to reinstate, without cost, after administrative proceedings are complete.

The Clerk is directed to send certified copies of this Memorandum Opinion to counsel of record.

---

**6.** The same language of the Pension Plan is used in a booklet prepared for distribution to Union members, summarizing pension benefits. In a section headed "Employment Not Credited", the booklet states in part:

> No credit is given toward pension eligibility for periods during which a miner is

> .    .    .    .    .

> Self-employment in the coal industry or otherwise directly connected with the ownership

or operation of a mine. Credit can be given, however, if applicant was producing coal for a signatory company which was responsible for royalty payments to the Fund on coal produced. Credit may also be given if applicant was a member of a cooperative mine, signatory to the contract, in which all employees shared the profits.