SEAFOOD WORKERS HEALTH FUND UNION TRUSTEES, Raymond Mathieu, James Pragana, Linda Howlett, Plaintiffs,

v.

SEAFOOD WORKERS HEALTH FUND MANAGEMENT TRUSTEES, Antone Demello III, Ralph Parsons, Charles Nunes,

and

Jerome Rubenstein, Defendants.

Civ. A. No. 83–0441–MA.

United States District Court,
D. Massachusetts.

Sept. 26, 1983.

John M. Xifaras, and William M. Straus, New Bedford, Mass., for plaintiffs.

Harvey Mickelson, New Bedford, Mass., Jerome S. Rubenstein, North Marshfield, Mass., for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

In this action, the employee-designated trustees of a health and welfare fund created to provide benefits to workers in the New Bedford fish processing industry seek a declaration that a plan for the administration of the fund proposed by the fund's employer-designated trustees is invalid under federal law. The matter comes before the Court on cross-motions for summary judgment.

There is no dispute about the facts, which are as follows. The Seafood Workers Health Fund (the Fund) was created by an Agreement and Declaration of Trust dated August 30, 1967. The Fund was established in accordance with the requirements of § 302 of the Labor Management Relations Act of 1947 (§ 302), 29 U.S.C. § 186. Section 302 generally prohibits payments by employers to union officials, but permits contributions to trusts jointly managed by union and management trustees for the exclusive benefit of employees. § 302(c)(5), 29 U.S.C. § 186(c)(5). The plaintiffs are the three trustees of the Fund selected by the New Bedford Seafood Workers Union. The defendants are the three Fund trustees chosen by the Seafood Dealers Association of New Bedford and the arbitrator chosen by the union and the management trustees to resolve the dispute that led to this litigation.

The collective bargaining agreement that originally governed employers' contributions to the Fund expired on July 29, 1981. A few of the employers in the New Bedford seafood processing industry have entered into new collective bargaining agreements with their employees. Most, however, have not. At a meeting of the trustees of the Fund on May 6, 1982, the union trustees offered a motion that the Fund extend benefits to all workers who had been employed in the New Bedford seafood processing industry on the date the original collective bargaining agreements expired. The management trustees voted against the proposal, creating a deadlock. At a meeting of the Fund trustees on May 20, 1982, the management trustees proposed that the Fund accept contributions from fish processing houses that were not parties to collective bargaining agreements with the union. The union trustees voted against this proposal, creating a second deadlock.

In accordance with the terms of the trust agreement establishing the Fund, and pursuant to the statutory plan, § 302(c)(5)(B), the trustees selected an impartial umpire,

the defendant Jerome Rubenstein, to break the deadlock. Rubenstein refused to arbitrate the dispute, fearing that one of the courses of action available to him—the management trustees' proposal to permit non-union employers to make contributions to the Fund—might constitute a violation of § 302(c)(5)(B), which prohibits employers from making contributions to jointly managed welfare funds unless "... the detailed basis on which such payments are to be made is specified in a written agreement with the employer." The plaintiffs filed this action under 28 U.S.C. § 2201, seeking a determination of the legal question impeding the arbitrator's willingness to resolve the dispute. This Court has jurisdiction under 28 U.S.C. § 1331.

Both the union and management trustees have filed motions for summary judgment. By his answer, Rubenstein has agreed to abide by the outcome of this litigation. There are no genuine issues of material fact. Summary judgment is appropriate, as the question presented in strictly one of law: whether, under § 302(c)(5) and the trust agreement establishing the Fund, non-union employers may contribute to the Fund on behalf of their employees.

The union trustees contend, first, that non-union employers may not make contributions to the Fund because § 302(c)(5)(B)'s requirement that "the detailed basis on which such payments are to be made [must be] specified in a written agreement with the employer ..." makes illegal any payment not made pursuant to a collective bargaining agreement. Neither the legislative history of § 302(c)(5) nor the cases that have addressed the question supports this view.

As the Supreme Court noted in *Arroyo v. United States,* 359 U.S. 419, 425–26, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959), Congress had a clear and narrow purpose in requiring that payments to welfare funds be made under a detailed written agreement:

> Those members of Congress who supported [§ 302] were concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control. Congressional attention was focused particularly upon the latter problem because of the demands which had then recently been made by a large international union for the establishment of a welfare fund to be financed by employers' contributions and administered exclusively by union officials (footnotes omitted).

The debate in the Senate on the adoption of § 302 identifies the evils that the requirement of a detailed written agreement was designed to remedy. Senator Taft offered the following remarks:

> The occasion of the amendment [ultimately adopted as § 302] was the demand made by the United Mine Workers of America that a tax of 10 cents a ton be levied on all coal mined, and that the tax so levied be paid into a general welfare fund to be administered by the union for practically any purpose the union considered to come within the term 'welfare.' Of course, the result of such a proceeding, if there is no restriction, is to build up a tremendous fund in the hands of the officers of the labor union, to be distributed for welfare, which they may use indiscriminately.

*Legislative History of the Labor Management Relations Act,* 1947 (1974), at 1310. As Senator Taft noted later in the same speech, § 302 was intended to impose criminal penalties "... in a case of extortion or a case where the union representative is shaking down the employer." *Id.,* at 1311. Nothing in the language or the legislative history of § 302 suggests that collective bargaining agreements are the only kind of written agreement that can fulfill the purposes of the statute, and a number of courts have permitted employers to make contributions to § 302(c)(5) trusts in the absence of collective bargaining agreements. *See Hinson v. N.L.R.B.,* 428 F.2d 133, 139 (8th Cir.1970); *Doyle v. Shortman,* 311 F.Supp. 187, 194–95 (S.D.N.Y.1970).

The *Hinson* and *Doyle* courts held that the agreement creating the trust, when read together with expired collective bargaining agreements, satisfied § 302(c)(5)(B)'s requirement that payments be made under a detailed written agreement. The union trustees argue, however, that the agreement establishing the Fund cannot serve as the written agreement required by § 302(c)(5)(B) because the non-union employers are not parties to that agreement. I agree. Section 302(c)(5)(B) clearly requires that "... the detailed basis on which such payments are to be made [must be] specified in a written agreement *with the employer*" (emphasis supplied). The trust agreement was executed for the "EMPLOYERS"—a defined term in the agreement—by the executive director of the Seafood Dealers Association of New Bedford. Unless the non-union employers fall within the definition of "EMPLOYER" in the agreement, they are not parties to the trust instrument establishing the Fund. Article II, § 2 of the trust, which defines "EMPLOYER," provides as follows:

> The term "EMPLOYER" as used herein shall mean any employer who enters into a collective bargaining agreement with the UNION and in accordance therewith assents to participate and contribute to the Welfare Fund and who has adopted this Agreement and Declaration of Trust and/or who is or becomes a member of the Seafood Dealers Association of New Bedford, Mass.

The management trustees argue that the last clause of the definition of "EMPLOYER" sweeps within the scope of that term every member of the Seafood Dealers Association of New Bedford, including the non-union employers. The more natural reading of the definition suggests that membership in the Seafood Dealers Association is

an alternative only to the explicit adoption of the trust agreement by an employer already bound by a collective bargaining agreement—not an alternative to the signing of a collective bargaining agreement. Thus I conclude that the trust agreement does not satisfy the requirement of § 302(c)(5)(B) that employer contributions to the Fund be made under a written agreement to which the contributing employer is a party.[1]

Deciding that the trust agreement creating the Fund does not constitute the "written agreement with the employer" required by § 302(c)(5)(B) does not, however, compel the conclusion that the non-union employers cannot make contributions to the Fund on behalf of their employees. It merely raises another question: whether the Fund may satisfy the requirements of § 302(c)(5)(B) by entering into a new agreement with the non-union employers. I conclude that it may. The language of § 302(c)(5)(B) does not indicate with whom the employer must contract, and does not insist that the employer make payments in accordance with a written agreement with the union. *But see Moglia v. Geoghegan,* 403 F.2d 110, 116 (2d Cir.1968), *cert. denied,* 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969) (dictum). Section 302 is a criminal statute which should be strictly construed. *See Arroyo v. United States,* 359 U.S. 419, 424, 79 S.Ct. 864, 867, 3 L.Ed.2d 915 (1959). The legislative history does not speak to the question whether the trust fund itself may enter into the written agreement required by § 302(c)(5)(B), but such action is unlikely to lead to the reappearance of the evils in welfare fund administration that § 302 was meant to address—bribery, extortion, and the like. Under the circumstances, I conclude that a trust properly established under § 302(c)(5)(B) may without violating that

---

1. The union trustees also argue that the definition of "EMPLOYEE" in the agreement excludes non-union workers and therefore prevents the Fund from accepting contributions from non-union employers on behalf of non-union employees under the rule of *Walsh v. Schlecht,* 429 U.S. 401, 408, 97 S.Ct. 679, 685, 50 L.Ed.2d 641 (1977). In fact, the trust explicitly includes non-union employees within the

definition of "EMPLOYEES." I decline to consider the union trustees' suggestion that an artificially narrow construction of "non-union" should be imposed. *See San Pedro Fishermens' Welfare Trust Fund Local 33 v. DiBernardo,* 664 F.2d 1344, 1345 (9th Cir.1982) ("The policy behind § 302(c)(5) requires that contract interpretation be confined to the written terms of the welfare trust fund agreement.")

statute enter into an agreement with an employer governing payments to the trust. The agreement may itself include provisions relating to the rates of contribution, or look to another agreement for that purpose.

One further word is in order. In choosing the trust vehicle to regulate the administration of § 302(c)(5)(B) welfare funds, Congress drew on a well-developed body of common law. *See Bricklayers, Masons and Plasterers International Union of America, Local Union No. 15, Orlando, Florida v. Stuart Plastering Company, Inc.,* 512 F.2d 1017 (5th Cir.1975). An important principle of that body of law looks to the purposes for which a trust was established to determine the powers of its trustees. *See* 3 *Scott on Trusts* § 186 (3d ed. 1967), at 1498. There is some disagreement among courts and commentators about whether, in the event of a dispute, § 302 intends that the arbitrator's view on the scope of a trust's purposes be final. *Compare Barrett v. Miller,* 276 F.2d 429 (2d Cir.1960) *with* Goetz, "Developing Federal Labor Law of Welfare and Pension Plans," 55 Corn.L.Rev. 911, 924 (1970). I have examined the trust under the more rigorous standard called for in the *Barrett* case and conclude that it is at least "fairly arguable" that the Fund's purpose sweeps broadly enough to include the course of action proposed by the management trustees. *See, e.g.,* Agreement and Declaration of Trust dated August 30, 1967, Art. III, § 1.

In sum, then, I hold that no violation of § 302 would occur if the management trustee's proposal were adopted. Under § 302(c)(5) and the trust agreement establishing the Fund, non-union employers may contribute to the Fund on behalf of their employees.

Accordingly, the plaintiffs' motion for summary judgment is denied. The defendants' motion for summary judgment is granted.

SO ORDERED.